# In the United States Court of Federal Claims

| | |
|---|---|
| JOSHUA R. ROSENE,<br>Plaintiff,<br>v.<br>THE UNITED STATES,<br>Defendant. | No. 25-cv-1871<br>Filed: September 3, 2026 |

*Jason E. Perry*, Law Office of Jason Perry, Wellington, FL, for Plaintiff.

*Reta E. Bezak* of the United States Department of Justice, Civil Division, Washington, D.C., for Defendant. With her on the briefs were *Douglas K. Mickle, Patricia M. McCarthy*, and *Brett A. Shumate* of the United States Department of Justice, Civil Division, Washington, D.C., and *Lieutenant Addison Osborne* of the United States Coast Guard.

**MEMORANDUM AND ORDER**

On June 5, 2024, Plaintiff Joshua R. Rosene entered a Reserve Officer Candidate Indoctrination course at the Leadership Development Center (LDC) of the United States Coast Guard (Coast Guard), a military service of Defendant the United States.[1] If Plaintiff had successfully graduated from the five-week course, he would have been commissioned as an officer in the Coast Guard Reserve on July 10, 2024.

[1] The Coast Guard is "a military service and a branch of the armed forces of the United States at all times." 14 U.S.C. § 101. The Coast Guard is "a service in the Department of Homeland Security, except when operating as a service in the Navy." 14 U.S.C. § 103(a). The Coast Guard transfers to the Navy during times of war, if Congress or the President directs a transfer. 14 U.S.C. § 103(b).

However, Plaintiff never completed the LDC course. On July 6, 2024, a course leader received reports that Plaintiff had used a racial slur and also had demeaned another trainee based on a purported disability. On July 8, 2024—two days before the training course ended—an LDC official suspended Plaintiff from the course. An investigator with the Coast Guard interviewed 10 Officer Candidates (OCs) in the course, including Plaintiff, and two course leaders. Only one OC reported hearing Plaintiff utter a racial slur. In contrast, six OCs reported hearing Plaintiff use derogatory language about another OC's purported disability. The OCs alleged that multiple OCs had confronted Plaintiff about his behavior because it interfered with the environment of the course.

On July 24, 2024, after reviewing this comprehensive investigation, an LDC official determined that there was insufficient evidence to corroborate the allegation that Plaintiff uttered a racial slur. However, the official determined that the evidence substantiated the allegation that Plaintiff had made derogatory comments about another trainee, amounting to harassment. Based on the finding of harassment, the official began the process to disenroll Plaintiff from the LDC course. While LDC officials identified Plaintiff's prior arrests as a possible reason to disenroll and discharge Plaintiff, they proceeded to disenroll him from the training course based on the above-referenced harassment. On September 5, 2024, the LDC disenrolled Plaintiff from the training course. On September 12, 2024, the Coast Guard separated Plaintiff from the service, with his last date of active duty service listed as July 12, 2024.

Subsequently, Plaintiff repeatedly challenged his disenrollment and suspension. On February 19, 2025, the Coast Guard denied Plaintiff's administrative appeal. On July 24, 2025, the Coast Guard again defended the investigation, disenrollment, and separation in a written statement after receiving congressional correspondence regarding Plaintiff's separation.

Plaintiff seeks another review of his case in this Court. Here, Plaintiff argues (i) that the Coast Guard's actions were arbitrary and capricious because the Coast Guard offered inconsistent explanations for the disenrollment and separation, (ii) that the record does not contain substantial evidence of harassment, (iii) that the scope of the investigation improperly expanded, (iv) that the evidence uncovered in the investigation does not meet the Coast Guard's definition of harassment, (v) that the Coast Guard denied Plaintiff an opportunity to respond, and (vi) that Plaintiff remains entitled to active duty pay. Plaintiff and Defendant have each moved for judgment on the administrative record.

For the reasons stated below, the Court **DENIES** Plaintiff's Corrected Motion for Judgment on the Administrative Record (ECF No. 15). The Court **GRANTS** Defendant's Cross-Motion for Judgment on the Administrative Record (ECF No. 16). After thoroughly reviewing the record, the Court holds that the Coast Guard's decision was supported by substantial evidence and was not arbitrary and capricious, that any procedural errors were harmless, and that Plaintiff is not entitled to continued active duty pay.

## BACKGROUND

### I. Commencement of the Investigation into Plaintiff's Behavior

Plaintiff entered the Coast Guard training program on June 5, 2024. AR 42.[2] On July 6, 2024, Assistant Course Chief C.R.[3] filed a "Report of Harassment, Hate, Bullying, Hazing,

[2] Citations to the AR refer to the Corrected Administrative Record (ECF No. 11). Citations throughout this Memorandum and Order correspond to the ECF-assigned page numbers, which do not always correspond to the pagination within the document.

[3] Defendant submitted a redacted version of the AR, so that witnesses and most individuals involved in the investigation are identified only by their initials. ECF No. 11. In the cross-Motions for Judgment on the Administrative Record, the parties refer to people by their initials, as identified in the AR, and have not otherwise objected to the use of initials. *See, e.g.*, Pl. MJAR at 7; Def. MJAR at 7.

Misconduct, or Other Disruptive Behaviors" concerning Plaintiff. AR 99. Assistant Course Chief C.R. "was made aware of a series of incidents involving [Officer Candidate (OC)] Rosene," earlier that day. *Id.* The alleged behavior, which Assistant Course Chief C.R. learned of "from direct witnesses," included several comments from Rosene directed at OC K, another member of Plaintiff's training class: "[w]hy are we listening to this re*tard," "K is an undiagnosed autistic," and "[w]hat a re*tard." *Id.* Assistant Course Chief C.R.'s report stated that Plaintiffs "was confronted multiple times by various OCs . . . and demanded to stop. The behavior continued and may have even intensified." *Id.*

Assistant Course Chief C.R.'s report stated that Plaintiff had allegedly engaged in other disruptive behaviors. *Id.* The report noted that "OC Rosene recently commented on the swim test failure for two black OCs." *Id.* Plaintiff "was heard stating out-loud to another OC that 'it is funny that the two that failed the swim test are n[****]rs.'" *Id.* Finally, Plaintiff's behavior toward his wife raised concerns among other OCs and Assistant Course Chief C.R.:

> OC Rosene has been overheard by multiple OCs yelling at his wife most nights on the phone, calling her 'stupid' and 'dumb'[] and berating her verbally. As soon as he would hang up the phone, he would continue his rant about his spouse to other OCs in his vicinity. OC Rosene also may have disclosed to another OC that he is in thousands of dollars of sports gambling debt. The report to [Assistant Course Chief C.R.] raised serious concern about use of alcohol and judgment as well as bullying and racism.

*Id.*

On July 8, 2024, the LDC, which ran Plaintiff's course, convened a "single-officer, standard investigation" into whether Plaintiff "engaged in prohibited language." AR 97. The LDC charged Investigating Officer N.T. with the investigation and directed N.T. to consult with Judge Advocate A.M., of Coast Guard Legal Service Command, "before beginning the investigation and during it if you need assistance." *Id.* Investigating Officer N.T. was specifically charged with

determining "whether OC Rosene made a hate incident, and used prohibited language towards OC K." *Id.*

On July 8, 2024, the same date the LDC began the investigation into Plaintiff's comments, the Coast Guard suspended Plaintiff from his training program:

> Due to an ongoing investigation, you are being suspended in training from Reserve Officer Candidate Indoctrination. You are being advised that Reserve Officer Candidate Indoctrination is required for commission in the U.S. Coast Guard Reserves.

AR 82. Plaintiff signed the form informing him of his suspension and initialed his acknowledgement." *Id.*

## II. Investigating Officer N.T.'s Investigation

Investigating Officer N.T. interviewed ten OCs, including Plaintiff. AR 46–47. N.T. also interviewed Course Chief A.M. and procured a written statement from Assistant Course Chief C.R. AR 47.

On July 9, 2024, at the time of Plaintiff's interview, N.T. presented Plaintiff with a form informing him of his *Miranda* rights and his rights under the Uniform Code of Military Justice. AR 84–85 (form signed at 4:17 p.m.); *see also* AR 64 (interview beginning at 4:17 p.m.). The form informed Plaintiff that he was under investigation for "making racially charged comments regarding two Officer Candidates and of making comments regarding an Officer Candidate's alleged disability, which are contrary to our core values." AR 84. Plaintiff signed his initials next to each of five statements informing him of his rights, including his right to remain silent and his right to consult with an attorney before answering any questions. AR 85. Plaintiff checked a box expressing his "desire to make a statement and/or answer any questions." *Id.* Plaintiff also signed his name on the form informing him of his rights. *Id.*

In his July 9, 2024, interview with N.T., Plaintiff "categorically denied" that he had uttered a racial slur and claimed that "that word is not in my vocabulary." AR 64. Plaintiff stated that he had never said that OC K had a disability: "he said he had heard several other people who mentioned "[OC K] may have a mental disability, but he never disparaged him." *Id.* Plaintiff stated that he has an autistic brother and "might have said something like 'yeah that's a symptom" when other OCs brought up OC K's alleged disability. *Id.* Plaintiff named seven other OCs who, he alleged, had previously said that OC K had a disability. *Id.* On July 15, 2024, Plaintiff also sent a letter to N.T., in which Plaintiff accused his roommate, OC W, of making the accusation that began the investigation, and suggested that OC W himself might have engaged in harassing behavior. AR 68. Plaintiff stated that OC W described himself as "quite good at reporting possible infractions to the chain of command, which might result in disciplinary action." *Id.* Plaintiff wrote that "[a] self-proclaimed whistleblower may believe he or she will acquire greater respect from their seniors by reporting and/or gain a sense of power by manipulating situations without regard to the harm of the individual." *Id.*

According to N.T.'s investigation, OC W was the only witness who reported hearing Plaintiff use "the N word" firsthand. AR 48, 54. According to N.T.'s interview notes, OC W stated that "OC Rosene implied that [two OCs] didn't pass the swim test because they were black." AR 54. N.T. then asked OC W about Plaintiff's utterance of a racial slur:

> I asked if he witnessed OC Rosene using the N word and he said "Yes." In their barracks room OC Rosene was talking about OC D and OC B and their failure in the swim test: "It's no surprise that the two people that failed the swim test were n****rs." OC W said that when he said "were n****rs" OC Rosene said it under his breath, and he didn't say it with hatred or intent.

*Id.* OC W alleged that another roommate, OC Kl, was in the barracks room when Plaintiff allegedly used a racial slur. AR 48. However, OC Kl did "not recall OC Rosene ever using the N

word, nor does he recall any conversation regarding their black shipmates, the swim test or other OCs who were not meeting the standard." AR 48, 57.

In contrast, six OCs told N.T. that they heard Plaintiff refer to OC K as disabled or otherwise demean OC K. AR 49. OC M told N.T. that on June 14, 2024, "OC M heard OC Rosene use the words 'retard' and 'autistic' to refer to OC K." AR 49, 52. In particular, "OC M said it was evident that it wasn't just a comment, people joke around yes but this was a more directed comment at OC K." AR 52. Five OCs "said they heard OC Rosene make fun of OC D at a dinner in Mystic, CT on or about" July 4, 2024. AR 49. OC W stated that "OC Rosene was drinking heavily" and said "'OC K is retarded,' [and] 'OC K has the 'tism.'" AR 54. OC S stated that "OC Rosene had been throwing back drinks (his shipmates had to cut him off because he had duty the next day) and started to make comments about OC K being retarded." AR 56. OC B said that "[w]hile everyone there might have had two beers over the course of dinner, OC Rosene had like six" and recounted a similar story as other attendees:

> At dinner OC Rosene made repeated comments about OC K saying he should not be in the program because he does not meet the medical standard. OC B said that OC Rosene said: he "has the 'tism," "It's obvious." OC Rosene said this over and over repeating that he "has the 'tism" and generally degrading OC K's character.

AR 58. OC R "recounted that there was a group of guys out at a restaurant and OC Rosene made some derogatory comments about OC K regarding his mental capacity." AR 62. OC T "said that comments were made by OC Rosene against OC K," so that another OC said "'[t]his needs to stop'" and the dinner attendees then cut Plaintiff off from drinking. AR 63.

N.T. did not interview OC K, the target of the alleged harassment. *See* AR 46–47 (listing witnesses interviewed). According to her investigation, none of the OCs who heard Plaintiff make derogatory comments said that they told OC K about the comments. AR 48.

During the investigation, Course Chief A.M. "brought three website articles to [N.T.'s] attention, two of which showed that OC Rosene was arrested on multiple occasions, one time was for impersonating a police officer. The third website listed a debt collection case against OC Rosene." AR 50. N.T. included a copy of an online article, dated September 1, 2015, in the investigation exhibits, which stated that a "Joshua R. Rosene" was arrested in Prince William County, Virginia, for impersonating a police officer. AR 70–71. N.T. included a copy of a page from "arrests.org," which stated that a "Joshua Robert Rosene" was arrested in Virginia on December 19, 2022, on charges of obstruction of justice and resisting arrest. AR 76. N.T. also included a printout of a website recording a debt collection lawsuit against Joshua Rosene in a Virginia state court, which was filed on March 4, 2022. AR 79.

The AR also includes a copy of a criminal history generated by the Department of Homeland Security on July 10, 2024, which has no apparent link to Plaintiff or the investigation into his conduct. AR 37. The criminal history covers the arrests in Florida of a "Joshua John Rankin-Rosenberg." AR 38. The criminal record displays several charges, including possession of cocaine, possession of marijuana, and tampering with physical evidence, arising from a May 10, 2017, arrest. AR 38–40. This criminal history is for someone with a different name than Plaintiff, whose arrest took place in a different state than Plaintiff's alleged arrests. *Compare* AR 38 (arrest of Joshua John Rankin-Rosenberg in Florida), *with* AR 76 (arrest of Joshua Robert Rosene in Virginia). The criminal history was not included as an attachment or enclosure in N.T.'s investigative report. *See* AR 50–51. Similarly, none of the other documents that the Coast Guard created during its investigation reference the criminal history of Joshua John Rankin-Rosenberg or the arrests listed therein. *See* AR.

## III. Administrative Action After the Investigation

On July 24, 2024, Captain Robert P. Hill of the LDC sent a memorandum (Final Action Memo) to Rear Admiral Jeffrey K. Randall of the Coast Guard Force Readiness Command (Force Readiness Command) concerning the investigation into Plaintiff. AR 44. The Final Action Memo stated that the report of harassment toward OC K was "substantiated," while the report of a racial slur was "unsubstantiated." *Id.* Captain Hill wrote that although OC W alleged that Plaintiff had used a racial slur, "[n]o other member could verify the potential hate incident comments, and the statements were not consistent; therefore, there was not enough evidence to reach the threshold of substantiation for the alleged hate incident." *Id.* However, the reports of harassment toward OC K were substantiated because "[s]ix OCs all corroborated that OC Rosene made several inappropriate comments regarding another OC on both 14 June and 04 July calling [] him 'retard' and 'autistic.'" AR 45. Captain Hill also wrote that the Coast Guard had "confirmed OC Rosene had 3 arrests including impersonating an officer, assault/brandishing, and DUI." *Id.*[4] Captain Hill found that Plaintiff engaged in "harassing behavior" and may have engaged in "non-disclosure of arrests." *Id.* As a result, Captain Hill concluded "I intend to disenroll OC Rosene, and he will be [Permanent Change of Station]ed back to [Coast Guard Recruiting Command] for disposition." *Id.*

On August 5, 2024, Captain Hill submitted a discharge recommendation for Plaintiff, which recommended that Plaintiff "be separated from the Coast Guard with an honorable discharge

[4] The AR does not include the underlying Coast Guard Investigative Service report that Captain Hill used to establish Plaintiff's prior arrests. *See* AR 45. Captain Hill does not reference or attach the Florida arrest report for Joshua John Rankin-Rosenberg, which is included in the AR and has no apparent link to the investigation. *See* AR 45. In addition, the arrest report for Joshua John Rankin-Rosenberg does not include the crimes of impersonating a police officer, driving under the influence, or brandishing a weapon, so Captain Hill could not have mistakenly relied upon Joshua John Rankin-Rosenberg's arrest record for his report. *See* AR 38–40.

by reason of convenience of the government due to erroneous enlistment." AR 34. Captain Hill notified Plaintiff of the recommendation of the same day and informed Plaintiff of his rights to consult with an attorney submit a rebuttal to the discharge recommendation. AR 35.

On September 5, 2024, LDC Instructor K.H. informed Plaintiff of his disenrollment from the LDC "after an erroneous enlistment and an investigation determined you had made prohibited comments." AR 43. A Record of Disenrollment Form (DD Form 785) stated that Plaintiff was disenrolled from training "due to an erroneous enlistment." AR 42. The form noted that if training had been completed successfully, Plaintiff would have commissioned on July 10, 2024. *Id.*

On September 12, 2024, the Coast Guard generated a Separation Authorization, which separated Plaintiff from the Coast Guard at the "Convenience of the Government," due to a "[f]ailure to complete commissioning or warrant program." AR 41. The effective date of the Separation Authorization was listed as July 12, 2024. *Id.*

**IV. Plaintiff's Appeal and Congressional Correspondence**

On October 9, 2024, Plaintiff appealed the determination of harassing behavior to Force Readiness Command. AR 14. Plaintiff appealed "on the basis that the convening authority incorrectly applied policy or disregarded/inappropriately weighed facts. It is also submitted based upon procedural error and non-compliance with mandatory policy requirements." *Id.* Plaintiff argued that the procedure followed during the investigation violated COMDTINST 5350.6, which is entitled "Harassing Behavior Prevention, Response, and Accountability." *Id.*; *see also* COMDTINST 5350.6 (Feb. 2023). Plaintiff alleged that the selection of Investigative Officer N.T. to complete the investigation violated a policy that the investigating officer must not have a relationship with the alleged perpetrator or witnesses because N.T. was an instructor at the LDC who knew the witnesses prior to the investigation. AR 15–16. As in his interview during the

investigation, Plaintiff stated that his brother is autistic, so that he would not make derogatory comments about anyone due to their suspected autism. AR 19.

On February 19, 2025, a Force Readiness Command official, Jennifer Sinclair, denied Plaintiff's appeal. AR 9. Sinclair wrote that she evaluated the appeal "based on whether the convening authority incorrectly applied policy, inappropriately weighed facts, and/or failed to consider evidence." *Id.* Sinclair wrote that she upheld the investigation with the following explanation:

> After careful consideration of your appeal, the underlying investigation, and the convening authority's final action memorandum, and in consultation with legal counsel, I find the convening authority properly adhered to all applicable policies and directives and appropriately considered all available relevant facts surrounding the harassing behavior.

*Id.*

On June 19, 2025, Plaintiff submitted a message to a Congressman, Representative John McGuire, III, through an online portal on Representative McGuire's site. AR 7–8. Plaintiff wrote that he "was summarily disenrolled and kicked out of the [United States Coast Guard] under the former Administration's vague and woke [Anti-Harassment and Hate Incident] policy and denied my commission [with] no due process." AR 8. On July 24, 2025, in response to a June 20, 2025, communication from Representative McGuire, the Coast Guard sent Representative McGuire a letter and wrote that Plaintiff's actions constituted "unwelcome verbal conduct that has the effect of unreasonably interfering with an individual's work performance." AR 5. The Coast Guard's response stated that "[t]he initial claims of fraudulent enlistment were investigated and found to be unsupported." AR 5. The AR contains no further information concerning the Congressman's inquiry into Plaintiff's separation. *See* AR.

**PROCEDURAL HISTORY**

On November 3, 2025, Plaintiff filed his Complaint. ECF No. 1 (Complaint). On February 6, 2026, Defendant filed the Administrative Record with the Court. ECF No. 9. On February 11, 2026, the Court entered a Scheduling Order, setting a briefing schedule for cross-motions for judgment on the administrative record, as well as the filing of a corrected administrative record. ECF No. 10 at 1. On February 13, 2026, Defendant filed a Corrected Administrative Record. ECF No. 11 (AR).

On March 16, 2026, Plaintiff filed his original Motion for Judgment on the Administrative Record. ECF No. 13. On March 17, 2026, Plaintiff filed a Motion to Strike and Refile Motion for Judgment on the Administrative Record, along with his Corrected Motion for Judgment on the Administrative Record. ECF Nos. 14 (Motion to Strike and Refile); 15 (Pl. MJAR). On March 23, 2026, the Court struck Plaintiff's original Motion for Judgment on the Administrative Record and granted leave for Plaintiff to file his Corrected Motion for Judgment on the Administrative Record. Minute Order dated Mar. 23, 2026.

On April 16, 2026, Defendant filed its Cross-Motion for Judgment on the Administrative Record and Response to Plaintiff's MJAR. ECF No. 16 (Def. MJAR) (collectively, with Pl. MJAR, the cross-MJARs). On April 30, 2026, Plaintiff filed his Reply in support of his MJAR and Response to Defendant's MJAR. ECF No. 17 (Pl. Reply). On May 14, 2026, Defendant filed its Reply in support of its MJAR. ECF No. 18 (Def. Reply).

On June 5, 2026, the Court scheduled an in-person oral argument on the cross-MJARs at the Court of Federal Claims in Washington, D.C., for July 15, 2026. Minute Order dated June 5, 2026. Subsequently, Plaintiff's counsel requested via email with the Court and Defendant's Counsel that the Court forgo oral argument due to travel considerations. Email from Jason Perry

(June 8, 2026, 1:12 p.m. EDT). Accordingly, on consent of the movant, the Court canceled oral argument on July 13, 2026. Minute Order dated July 13, 2026.

The cross-MJARs are fully briefed and ripe for review.

## APPLICABLE LEGAL STANDARDS

Military pay cases at the Court of Federal Claims are resolved under Rule 52.1(c), which allows Motions for Judgment on the Administrative Record. Rules 52.1(c), App. K. ¶ 4. A Motion for Judgment on the Administrative Record provides an expedited trial on a "paper record, allowing fact-finding by the trial court." *Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005) (referencing Rule 56.1, which was replaced by Rule 52.1(c)); *see* Rule 52.1(c). Unlike at summary judgment, genuine disputes of material fact do not preclude the Court from granting a motion for judgment on the administrative record. *Bannum*, 404 F.3d at 1357.

In military pay cases, "judicial review . . . is conducted under the [Administrative Procedure Act (APA)."[5] *Walls v. United States*, 582 F.3d 1358, 1367 (Fed. Cir. 2009); *see* 5 U.S.C. § 706(2). Under this standard, the Court must determine whether the military's decision "is arbitrary, capricious, contrary to law, or unsupported by substantial evidence." *Barnick v. United States*, 591 F.3d 1372, 1377 (Fed. Cir. 2010); *see Porter v. United States*, 163 F.3d 1304, 1312 (Fed. Cir. 1998). The plaintiff must show such a violation of this standard by "cogent and clearly convincing evidence." *Stine v. United States*, 92 Fed. Cl. 776, 791 (2010), *aff'd*, 417 F. App'x 979 (Fed. Cir. 2011) (quoting *Kirwin v. United States,* 23 Cl. Ct. 497, 503 (1991)).

[5] Although Plaintiff does not challenge the decision of a military correction board in this case, each party cites cases that challenged a correction board's decision for the legal standard that applies here. Pl. MJAR at 13; Def. MJAR at 10. Neither party disputes that the arbitrary and capricious standard that applies to the review of a military corrections board's decision also applies in this case. *See* Pl. MJAR at 13; Def. MJAR at 10.

The Court considers whether the "agency provided a coherent and reasonable explanation of its exercise of discretion." *Dell Fed. Sys., L.P. v. United States*, 906 F.3d 982, 992 (Fed. Cir. 2018) (quoting *Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1351 (Fed. Cir. 2004)). Still, this Court does not serve as a "super correction board." *Van Cleave v. United States*, 70 Fed. Cl. 674, 678 (2006) (quoting *Skinner v. United States,* 594 F.2d 824, 830 (Ct. Cl. 1979)). "[T]he standard of review does not require a reweighing of the evidence, but a determination whether *the conclusion being reviewed* is supported by substantial evidence." *Heisig v. United States*, 719 F.2d 1153, 1157 (Fed. Cir. 1983) (emphasis in original). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Strand v. United States*, 951 F.3d 1347, 1351 (Fed. Cir. 2020) (quoting *Consol. Edison Co. of NY v. NLRB*, 305 U.S. 197, 229 (1938)). That is, the Court may not substitute its judgment for that of the military because "responsibility for determining who is fit or unfit to serve in the armed services is not a judicial province." *Stine*, 92 Fed. Cl. at 791 (quoting *Heisig,* 719 F.2d at 1156). The Court is restricted to evaluating whether the military has done its duty in examining all relevant evidence and making reasoned determinations. *See id.*

If the military "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise," then the Court must overturn the military's decision. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *see Ala. Aircraft Indus., Inc.-Birmingham v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009); *Adams v. United States*, 117 Fed. Cl. 628, 654 (2014). Similarly, the military must explain inconsistencies in its reasoning when it reaches contradictory conclusions based on the same evidence. *Draper v. United States*, 163 Fed. Cl. 284, 292–93 (2022) ("While

the Government's argument is certainly plausible, 'an agency cannot simply adopt inconsistent positions without presenting some reasoned analysis.'" (quoting *Quinton v. United States*, 64 Fed. Cl. 118, 129 (2005))). However, the Court will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974); *Viernes v. United States*, No. 25-117, 2026 WL 2236972, at *8 (Fed. Cl. July 31, 2026).

In military pay cases, the Court applies the "strong, but rebuttable, presumption that administrators of the military, like other public officers, discharge their duties correctly, lawfully, and in good faith." *Doe v. United States*, 132 F.3d 1430, 1434 (Fed. Cir. 1997) (quoting *Sanders v. United States*, 594 F.2d 804, 813 (Ct. Cl. 1979)). "Judicial deference must be 'at its apogee' in matters pertaining to the military and national defense." *Voge v. United States*, 844 F.2d 776, 779 (Fed. Cir. 1988) (quoting *Rostker v. Goldberg*, 453 U.S. 57, 70 (1981)); *see Kelly v. United States*, 179 Fed. Cl. 313, 322 (2026). The Court "may not substitute its judgment for that of the agency, but instead must confine itself to ensuring that the agency remained 'within the bounds of reasoned decisionmaking.'" *Sharpe v. United States*, 935 F.3d 1352, 1358 (Fed. Cir. 2019) (cleaned up) (quoting *Dep't of Commerce v. New York*, 588 U.S. 752, 773 (2019)). Even if a plaintiff identifies an error in the military's reasoning, though, the plaintiff must still establish that the error was not harmless. *Christian v. United States*, 337 F.3d 1338, 1343 (Fed. Cir. 2003) ("This court and its predecessor court have applied the harmless error analysis to military back pay cases."); *see Kelly*, 179 Fed. Cl. at 322.

## DISCUSSION

Plaintiff argues that the Coast Guard's disenrollment and separation decisions were arbitrary, capricious, contrary to law, and unsupported by substantial evidence based on five

arguments. Pl. MJAR at 14. Plaintiff also argues that the Coast Guard "did not lawfully discharge" him, so "he therefore remains entitled to pay and allowances under the Military Pay Act." *Id.* at 22.

Defendant argues that the disenrollment and separation decisions were supported by substantial evidence and were not arbitrary, capricious, or contrary to law. Def. MJAR at 12. Defendant also argues that Plaintiff is ineligible for pay and allowances under the Military Pay Act. Def. MJAR at 19.

## I. Disenrollment and Separation Decisions

Plaintiff makes five arguments against the Coast Guard's disenrollment and separation decisions based on offensive remarks about another OC. Pl. MJAR at 14–22. *First*, Plaintiff argues that the decisions were arbitrary and capricious because "the Coast Guard never maintained a consistent explanation" of what the investigation revealed and why it justified Plaintiff's disenrollment. *Id.* at 15. *Second*, Plaintiff argues that the investigation "overstates the evidence" and "did not account for contrary evidence." *Id.* at 17. *Third*, Plaintiff argues that N.T.'s investigation[6] improperly exceeded its authorized scope. *Id.* at 18–19. *Fourth*, Plaintiff argues that "[t]he Coast Guard did not apply the governing harassment standard to the facts in the record." *Id.* at 19. *Fifth*, Plaintiff argues that the Coast Guard never provided him "any meaningful opportunity to respond" to the accusations against him. *Id.* at 21.

Defendant opposes Plaintiff's arguments. Def. MJAR at 12. Defendant argues that Plaintiff cannot identify prejudicial error in the Coast Guard's inconsistent explanations. *Id.* at 17. Defendant argues that the Coast Guard properly weighed conflicting evidence in the record and

[6] Unlike in his administrative appeal to Force Readiness Command, *see* AR 15–16, Plaintiff does not argue in this case that N.T. was improperly appointed to investigate the alleged harassing remarks. *See* Pl. MJAR at 18–19.

reached a decision based on substantial evidence. *Id.* at 16. Defendant contends that "Mr. Rosene's argument that the convening order limited the scope of the investigation is unfounded." *Id.* at 15. Defendant argues that Plaintiff's comments about OC K qualified as harassment under Coast Guard policy. *Id.* at 14. Finally, Defendant argues that the Coast Guard provided Plaintiff with the procedural rights to which he was entitled, such as the opportunity to submit a written statement and to consult with an attorney. *Id.* at 19.

### A. Allegedly Inconsistent Explanations for Disenrollment

Plaintiff argues that the Coast Guard's disenrollment decision was arbitrary because "the Coast Guard never maintained a consistent explanation of what it found, why those findings mattered, and how they justified the specific personnel action imposed." Pl. MJAR at 15. Plaintiff contends that there is no "coherent path from the investigation the Coast Guard authorized to the disposition it ultimately imposed" because Captain Hill's Final Action Memo cited harassment as the reason for disenrollment, but later paperwork cited erroneous enlistment in addition to harassment. *Id.* ("An agency acts arbitrarily when it does not articulate a rational connection between the facts found and the choice made."). Defendant asserts that the Coast Guard considered erroneous enlistment but ultimately did not make a determination on that basis, so Plaintiff cannot demonstrate that any mention of erroneous enlistment prejudiced him. Def. MJAR at 17; Def. Reply at 10–11.

Military agencies act in an arbitrary and capricious manner if they "simply adopt inconsistent positions without presenting some reasoned analysis." *Draper*, 163 Fed. Cl. at 292 (quoting *Quinton*, 64 Fed. Cl. at 129). In *Draper*, the Secretary of the Air Force had taken two contradictory positions on the same servicemember's performance based on the same evidence: the Secretary of the Air Force decided that the servicemember, a colonel, was eligible for

promotion to brigadier general for good performance but also decided that the servicemember could be retired and demoted to lieutenant colonel for unsatisfactory performance. *Id.* Where the "conclusions somewhat conflict," the agency had to provide "reasoned analysis and explanation" for why the same evidence could lead to seemingly contradictory results in two different decisions. *Id.*

In Plaintiff's case, in contrast, the Coast Guard did not make the same seemingly contradictory decisions, and any conflict is explained in the record. The references to "erroneous enlistment" in documents related to Plaintiff's disenrollment from the LDC do not render the Coast Guard's actions arbitrary for inconsistency. *See* AR 43 (listing "erroneous enlistment" and "prohibited comments" as reason for disenrollment). During the course of her investigation, N.T. learned of Plaintiff's prior arrests and the alleged debt collection lawsuit against Plaintiff. AR 50. After the investigation, Captain Hill of the LDC wrote that "there may be non-disclosure of arrests in OC Rosene's [Reserve Officer Candidate Indoctrination] application package." AR 45. Captain Hill's memo is clear that he planned to disenroll Plaintiff due to the harassment. *Id.* Captain Hill was clear that his only finding was that "OC Rosene did engage in harassing behavior." *Id.* In contrast, Captain Hill wrote that "there may be" non-disclosure problems that could lead to erroneous enlistment; the conditional language indicates that Captain Hill suggested an additional basis on which the Coast Guard might discharge Plaintiff. *Id.* Unlike in *Draper*, where there were conflicting decisions because the agency stated that a servicemember both deserved a promotion and a demotion, here the possibility of an erroneous enlistment due to a criminal record was, at most, an additional reason to remove Plaintiff from the Coast Guard, which did not conflict with the finding that Plaintiff's behavior at LDC constituted harassment. *See Draper*, 163 Fed. Cl. at 292; AR 45.

The Coast Guard consistently maintained that harassment was a basis for Plaintiff's disenrollment, and that this disenrollment justified the separation decision as it caused Plaintiff's "[f]ailure to complete commissioning or warrant program." AR 41. Plaintiff failed to complete his commissioning program because the LDC suspended and then disenrolled Plaintiff from the commissioning program. *See* AR 43 (disenrolling Plaintiff due to "prohibited comments" and suspected "erroneous enlistment"), 82. The LDC suspended Plaintiff "[d]ue to an ongoing investigation." AR 82. Allegations of harassment and hate speech sparked that investigation. AR 97. After that investigation, the LDC determined that "[t]he alleged harassing behavior is **substantiated**." AR 44 (emphasis in original). The LDC determined that the harassment allegation was substantiated because Plaintiff made prohibited comments: "OC Rosene made several inappropriate comments regarding another OC on both 14 June and 04 July calling [] him 'retard' and 'autistic.'" AR 45. In addition, Captain Hill's Final Action Memo stated that "[t]he aggrieved party will be notified in writing of the disposition of the investigation" and concludes with a statement that "all Coast Guard personnel shall be treated with respect." AR 45. These statements only make sense if the harassment was a basis for disenrollment, as an erroneous enlistment would not involve any aggrieved parties or disrespect for other personnel. *See id.* The LDC subsequently disenrolled Plaintiff from the commissioning program because "an investigation determined you had made prohibited comments," and the LDC listed "erroneous enlistment" as an additional reason for disenrollment. AR 43. After the separation, the Coast Guard explained that Plaintiff's comments constituted harassment because it was "unwelcomed verbal conduct that has the effect of unreasonably interfering with an individual's work performance." AR 5. Thus, throughout and after the suspension, investigation, disenrollment, and separation, the Coast Guard consistently maintained that the harassment served as a sufficient basis

for Plaintiff's dismissal. Plaintiff's harassment was the reason that he never completed the course at LDC, and his failure to complete the course led to the separation. AR 41. As the Coast Guard's "path may reasonably be discerned" in determining that Plaintiff harassed another CO and disenrolling Plaintiff for harassment, the Court must uphold the Coast Guard's actions. *See Bowman Transp.*, 419 U.S. at 286.

The AR does not explain why the LDC listed only "erroneous enlistment" as the justification on a form recording Plaintiff's disenrollment. *See* AR 42 ("Member is being disenrolled . . . due to an erroneous enlistment.").[7] However, to the extent that these references to erroneous enlistment constitute conflicting explanations by the Coast Guard, it is a harmless error because the Coast Guard later clarified that Plaintiff was disenrolled and separated solely on the basis of the harassment uncovered during the investigation. AR 5, 9. Under the APA standard, an error in an interim agency document is not prejudicial if the agency identifies a proper basis for its actions by its final decision, and here the record demonstrates that the Coast Guard approved the disenrollment based on harassment and separated Plaintiff based on his failure to complete training. *WellPoint Mil. Care Corp. v. United States*, 953 F.3d 1373, 1380 (Fed. Cir. 2020) ("[W]e

[7] Similarly, Captain Hill wrote in a Notification of Intent to Discharge that he "initiated action to discharge" Plaintiff on the basis of "erroneous enlistment." AR 35. The Notification of Intent to Discharge is separate from the Final Action Memo, which approved disenrollment based on harassment. *Compare id., with* AR 45. The reliance upon erroneous enlistment in the Notification of Intent to Discharge cannot have prejudiced Plaintiff because, as the record makes clear, the LDC (where Captain Hill worked) had the power to disenroll Plaintiff, but another office in the Coast Guard (Personnel Service Center Reserve Personnel Management Division (PSC-RPM)) made the discharge and separation decision. AR 41 ("This separation action has been authorized pursuant to [Coast Guard] PSC-RPM decision."), 43 ("[A] determination will be made as to your disposition with the Personnel Service Center Reserve Personnel Management Division."). The Notification of Intent to Discharge itself acknowledged that it was only a recommendation, and that "[t]he decision on your discharge and type of discharge" would be made by PSC-RPM. AR 35. PSC-RPM did not follow Captain Hill's recommendation because it authorized Plaintiff's separation based only on "[f]ailure to complete commissioning or warrant program." AR 41.

need not be concerned with errors in the interim reports . . . unless they were carried forward to the [] final decision."). After Plaintiff appealed his disenrollment, the Coast Guard sustained the disenrollment exclusively on the basis of the "harassing behavior" that was uncovered during the investigation, which demonstrates that Plaintiff would have been disenrolled even without the mention of the erroneous enlistment. AR 9. The Coast Guard separated Plaintiff due to his "[f]ailure to complete commissioning . . . program," which was caused by the harassment investigation. AR 41. In response to the Congressman's communication, as well, the Coast Guard also explained that the disenrollment and separation were undertaken on the basis of Plaintiff's "unwelcome[e] verbal conduct," rather than erroneous enlistment. AR 5. As the Coast Guard maintained a consistent explanation for the disenrollment and subsequent separation caused by the findings of harassment, and any error introduced by references to erroneous enlistment was not prejudicial, the disenrollment and separation decisions were not arbitrary. *See Sargisson v. United States*, 913 F.2d 918, 923 (Fed. Cir. 1990) (denying plaintiff's military pay claim when evidence in the record demonstrated that "he could not have been prejudiced" by alleged error).

**B. Evidence of Harassment**

Plaintiff argues that the Coast Guard failed to fully consider the evidence before it when it made its decision. Pl. MJAR at 16–17. In particular, Plaintiff argues that the "Final Action Memorandum's categorical statement that 'six OCs' corroborated that Mr. Rosene called OC K 'retard' and 'autistic' on both dates therefore goes beyond what the underlying summaries actually show." *Id.* at 17. Defendant argues that the Coast Guard properly weighed evidence in the record. Def. MJAR at 16.

The record contains substantial evidence to support the Final Action Memo's finding that Plaintiff "engage[d] in harassing behavior" by making derisive comments about OC K. *See*

*Strand*, 951 F.3d at 1351 ("Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" (quoting *Consol. Edison*, 305 U.S. at 229)); AR 45. In *Strand*, the Court of Appeals for the Federal Circuit (Federal Circuit) held that a military department's denial of service credit was supported by substantial evidence because the deciding official undertook a "thorough consideration" of situation based on "a broad review" of the record. *Strand*, 951 F.3d at 1351, 1354. Substantial evidence supported the decision even though the deciding official "weighed certain aspects of the record differently" than other officials and the plaintiff did. *Id.* at 1356. In particular, the deciding official's alleged "insufficient consideration" of countervailing evidence when justifying the decision did not render the decision unsupported by substantial evidence. *Id.* Here, Plaintiff merely weighs evidence in the record differently than the Coast Guard, as Plaintiff argues "little or no real engagement" with "contrary evidence" renders the Final Action Memo unlawful. Pl. MJAR at 17. To the contrary, the lack of a specific mention of Plaintiff's own denials and the OCs who never heard Plaintiff use offensive language does not mean that Captain Hill lacked sufficient evidence for the Final Action Memo. AR 45; *see Strand*, 951 F.3d at 1356. Rather, Captain Hill wrote in the Final Action Memo that Plaintiff engaged in harassing behavior because, as the record before Captain Hill reflected, six direct witnesses told an investigator that Plaintiff engaged in such behavior. AR 45 (referencing N.T.'s investigation for evidence of harassing behavior), 48–49 (N.T.'s investigation recording accounts of six direct witnesses to harassing behavior). Direct accounts from six of Plaintiff's colleagues, including five witnesses to the same dinner, that all recounted the use of slurs and demeaning language directed at another OC is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Strand*, 951 F.3d at 1351 (quoting *Consol. Edison*, 305 U.S. at 229). This Court is not empowered to re-weigh the evidence before Captain Hill where substantial evidence supports

his determination. *See Heisig*, 719 F.2d at 1157; *Sharpe*, 935 F.3d at 1359 ("We may not substitute our judgment for that of [the agency], but instead must confine ourselves to ensuring that [it] remained 'within the bounds of reasoned decisionmaking.'" (quoting *Dep't of Commerce*, 588 U.S. at 773)); AR 45.

Captain Hill's Final Action Memo also reflects a full consideration of the conflicting evidence. Plaintiff quotes *Valles-Prieto v. United States*, 159 Fed. Cl. 611, 618 (2022), for the proposition that an action lacks substantial evidence if an agency "cherry-pick[s]" or "fail[s] to consider the entire record." Pl. MJAR at 13. To the extent that *Valles-Prieto* is persuasive, it does not apply to this case. There, a military board wrote that a plaintiff "failed to provide *any evidence*" supporting a fact, even though the plaintiff had provided some evidence. *Valles-Prieto*, 159 Fed. Cl. at 617 (emphasis in original). The military's statement that a plaintiff failed to provide any evidence supporting a fact when he actually provided such evidence revealed that the military board had failed to consider the evidence in the record. *See id.* at 617–18.

Here, in contrast, both N.T.'s investigation and Captain Hill's Final Action Memo following that investigation reflect a consideration of the full record, including consideration of contrary evidence. N.T.'s investigation into Plaintiff's comments explicitly presents evidence from a range of sources favorable and not favorable to Plaintiff, which establishes that N.T. considered contrary evidence. *See Mazarji v. United States*, 164 Fed. Cl. 298, 311 (2023) (holding that military board did not cherry-pick record evidence when board decision "explicitly lists" contrary evidence it considered). For example, N.T.'s investigative report included both OC W's allegation that Plaintiff used a racial slur and Plaintiff's former roommate OC Kl's testimony that he never heard Plaintiff utter the word. AR 48. Similarly, N.T.'s investigative report included detailed descriptions of what she learned from six witness interviews about Plaintiff's alleged

harassment of OC K, along with Plaintiff's denial that he had ever made the comments. AR 48–50. N.T. recounts OC M's allegation that Plaintiff described OC K as "retard" and "autistic" on June 14, 2024. AR 49. Plaintiff argues that N.T.'s investigation was flawed because "the summaries do not present a single uniform account of who heard what, when, and in what exact terms" at a dinner when the other five witnesses heard Plaintiff disparage OC K. Pl. MJAR at 16. However, N.T.'s investigative report acknowledges these slight discrepancies about what each attendee recalled. AR 49–50. Of the five dinner attendees besides Plaintiff, four recounted hearing Plaintiff make derogatory comments concerning OC K's metal capacity, and three of the attendees recalled that Plaintiff used the specific terms "retarded," "autism," or "'tism." *Id.* N.T.'s report acknowledges that the fifth attendee, OC T, did not recall that specific language, but notes that OC T remembered Plaintiff criticizing OC K to the point that another OC at the table "checked OC Rosene and said, 'This needs to stop.'" *Id.* Furthermore, N.T. included Rosene's own denials, his attempts to incriminate someone he suspected to be his accuser, and references to three other OCs who stated that they "did not witness OC Rosene use any discriminatory language in general or any negative language about OC K and though OC Rosene was a good guy." AR 50. Thus, N.T.'s investigative report considered the entire range of conflicting evidence before the Coast Guard. *See Mazarji*, 164 Fed. Cl. at 311.

In his Reply, Plaintiff also quotes *Heisig*, 719 F.2d at 1157, for the proposition that the agency must consider "'all of the competent evidence,' including evidence that detracts from the agency's conclusion." Pl. Reply at 2. Plaintiff argues that Captain Hill's Final Action Memo "did not address" countervailing evidence. *Id.* In *Heisig*, the Federal Circuit held that substantial evidence supported the agency decision where the agency considered the whole record and "there was evidence both ways." *Heisig*, 719 F.3d at 1157. Similarly, here, Captain Hill wrote that he

conducted "a thorough review of . . . the enclosed investigative report." AR 44. Under the presumption of regularity, the Court presumes that Captain Hill reviewed the entire report, as is reflected in the Final Action Memo. *Doe*, 132 F.3d at 1434; AR 44. In addition, the Federal Circuit has held that a decision that "makes little mention" of countervailing evidence does not violate the APA standard, as long as substantial evidence supports the decision and the decisionmaker reviewed the full record. *Strand*, 951 F.3d at 1356. Here, Captain Hill's Final Action Memo meets the APA standard because he reviewed the whole record and made a decision based on substantial evidence. *See id.*; AR 44–45.

In addition, Captain Hill clearly considered evidence that contradicted the allegations against Plaintiff because Captain Hill determined that one of the allegations was unfounded. *See* AR 44. Captain Hill found that one allegation (of harassment against OC K) was substantiated, and that another allegation (of saying a racial slur) was unsubstantiated. *Id.* The testimony of one witness supported the allegation that Plaintiff used a racial slur. *Id.* In order to find that the allegation of saying a racial slur was unsubstantiated, Captain Hill must have considered and given credence to the contrary evidence, that "[n]o other member could verify the potential hate comments, and the statements were not consistent." *Id.* Where the Coast Guard considered the evidence against the investigation and even rejected one of the allegations against him, Plaintiff cannot establish that the evidence "received less than adequate consideration." *See Heisig*, 719 F.2d at 1157; AR 44.

### C. <u>Scope of Investigation</u>

Plaintiff argues that N.T.'s "investigation exceeded the scope of the appointment memorandum" because the appointment memorandum directed an investigation of a hate incident

and prohibited language, while N.T.'s report included the website articles about Plaintiff's arrests and debt collection lawsuit. Pl. MJAR at 18.[8]

The appointment memorandum instructed N.T. to "conduct" an investigation "into whether OC Rosene made a hate incident, and used prohibited language towards OC K." AR 97. The appointment memorandum also directed N.T. to "[c]ontact your legal advisor if you discover additional allegations during your investigation. Your legal advisor will then contact me to amend the convening order, as appropriate." AR 98. N.T.'s report states that "Legal Service Command provided all necessary legal advice and assistance with this case" but does not state whether N.T. contacted a legal advisor concerning the allegations of Plaintiff's arrests and debt collection lawsuit. AR 46. To the extent that N.T. may have violated the instruction to consult with a lawyer if additional allegations arose, it was harmless error, and insufficient for Plaintiff to sustain his claims. *See Christian*, 337 F.3d at 1343 ("This court and its predecessor court have applied the harmless error analysis to military back pay cases."). Under harmless error analysis, "even if the government has considered an impermissible criterion in making a decision adverse to the plaintiff, it can nonetheless defeat liability by demonstrating that it would have made the same decision absent the forbidden consideration." *Texas v. Lesage*, 528 U.S. 18, 20–21 (1999). Here, even if N.T. erred by expanding the scope of the investigation, that error was harmless because the

[8] Plaintiff also argues that the "investigative packet" included the arrest record from Florida for Joshua John Rankin-Rosenberg, who is not Plaintiff. Pl. MJAR at 18. Plaintiff argues that the "record does not show that the approval authority recognized the mistaken inclusion of another person's criminal records or excluded that material from consideration." *Id.* To the contrary, although the Coast Guard never explains the inclusion of a different person's arrest report in the AR, it is clear that the LDC did not rely upon this report because Captain Hill's Final Action Memo lists different crimes committed by Plaintiff than Joshua John Rankin-Rosenberg's arrest record includes. *Compare* AR 38–40 (listing Joshua John Rankin-Rosenberg's arrest and charges for drug possession, tampering with physical evidence, and possession of drug paraphernalia)*, with* AR 45 (Final Action Memo stating that Plaintiff had been arrested for "impersonating an officer, assault/brandishing, and DUI).

record demonstrates that the Coast Guard would have disenrolled Plaintiff from the LDC course based on the harassment alone. *See id*; AR 5 (stating that Plaintiff was disenrolled and separated based on "unwelcomed verbal conduct" alone because "[t]he initial claims of fraudulent enlistment were investigated and found to be unsupported"), 45 (recommending disenrollment based on harassment and noting possible "non-disclosure of arrests"). As any error regarding the scope of the investigation was harmless, Plaintiff has not identified a sufficient basis to sustain his claim. *See Christian*, 337 F.3d at 1343; *Sargisson*, 913 F.2d at 923 (holding that plaintiff could not sustain a military pay claim when "he could not have been prejudiced" by the alleged error).

**D. Harassment Standard**

Plaintiff argues that his behavior, as determined by the Coast Guard's investigation, does not meet the Coast Guard's standard for harassment. Pl. MJAR at 19. Under Plaintiff's interpretation of the relevant regulations, "[i]t is not enough to identify offensive or inappropriate remarks and stop there." *Id.* at 20. Plaintiff argues that the evidence does not meet the harassment standard because "[t]here is no evidence of interference with OC K's work performance, and no evidence that OC K heard the alleged remarks." *Id.* Defendant asserts that Plaintiff's statements about OC K violated Coast Guard regulations. Def. MJAR at 15. Defendant contends that "the record demonstrates that Mr. Rosene's conduct constituted prohibited comments because of its impact on his classmates." Def. Reply at 8.

In the Final Action Memo, Captain Hill cited COMDTINST 5350.6, Harassing Behavior, Prevention, Response, and Accountability, as the policy that Plaintiff violated. AR 44. Captain Hill determined that Plaintiff engaged in "harassing behavior." AR 44. Within the version of

COMDTINST 5350.6 applicable to Plaintiff's disenrollment and suspension,[9] "harassing behavior" includes "harassment."[10] COMDTINST 5350.6 ¶ 12 (2023). The Coast Guard regulations defined harassment as follows:

> Harassment is unwelcome conduct, whether verbal, nonverbal, or physical, that has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, offensive, or hostile environment. Harassment includes conduct—whether or not based on a protected status—that includes, but is not limited to, race, sex gender, or gender identity (*see* Appendix A).

COMDTINST 5350.6 ¶ 12(a) (2023).

Substantial evidence in the record demonstrates that Plaintiff's behavior was "unwelcome conduct" that "create[ed] an intimidating, offensive, or hostile environment." *Id.*; *see* AR 45. According to the interviews in N.T.'s investigation, several of Plaintiff's fellow trainees told him that he needed to stop making derogatory comments and that his comments had created an offensive environment. AR 54 ("OC W . . . became uncomfortable around OC Rosene and didn't know how to talk to him and found himself wearing his headphones more."), 61 ("OC E said that when people talk about [Plaintiff], they talk about how inappropriate he can be."). Other trainees repeatedly felt the need to step in to stop Plaintiff's behavior. AR 52 ("OC M said, 'If you don't back off K, we are going to have a problem.' OC S separated them."), 56 ("OC B stepped in and told him to cut it out and they got into it."). The record clearly contains substantial evidence that

---

[9] The 2023 version of COMDTINST 5350.6 was in effect at the time of Plaintiff's disenrollment and discharge. *See* AR 48 (quoting the 2023 definition of "[h]arassment"). In November 2025, after Plaintiff was separated from the Coast Guard and had appealed his separation, the Coast Guard released an updated version of the regulation. *See* COMDTINST 5350.6 (2025); AR 9 (denying Plaintiff's appeal on Feb. 19, 2025), 41 (authorizing Plaintiff's separation on Sep. 12, 2024, with an effective date of July 12, 2024).

[10] Harassing behavior also includes sexual harassment, hazing and bullying, and retaliation or reprisal. COMDTINST 5350.6 ¶ 12. The Coast Guard investigated Plaintiff's comments about OC K as harassment and not any other type of harassing behavior. *See* AR 48.

Plaintiff's "unwelcome conduct" had the effect of creating an "offensive . . . environment" within the LDC course. *See* COMDTINST 5350.6 ¶ 12(a) (2023).

Plaintiff argues that his actions do not meet the standard for harassment because "[t]here is no evidence of interference with OC K's work performance, and no evidence that OC K heard the alleged remarks." Pl. MJAR at 21. The plain text of the regulation does not support Plaintiff's argument that the target of the harassment must be aware of the comments in order for them to constitute harassment. *See* COMDTINST 5350.6 ¶ 12(a) (2023). To determine whether the term "harassment" applies even when the subject of the harassment does not learn of demeaning statements, the Court begins with the text of the Coast Guard regulation. *See Southwest Airlines Co. v. Saxon*, 596 U.S. 450, 457 (2022) ("As always, we begin with the text."); *see also Barry v. McDonough*, 101 F.4th 1348, 1352 (Fed. Cir. 2024) ("When interpreting a regulatory provision, we apply the rules of statutory construction."). "If the statutory language is plain, [the Court] must enforce it according to its terms." *King v. Burwell*, 576 U.S. 473, 486 (2015). When considering whether the language is plain, "[the Court] must read the words in their context and with a view to their place in the overall statutory scheme." *Id.* (internal quotation marks and citation omitted); *see also West Virginia v. Env't Prot. Agency*, 597 U.S. 697, 721 (2022). Plaintiff's argument contravenes the plain text of the Coast Guard's harassment definition, under which harassment includes "conduct . . . that has the purpose or effect of . . . creating an intimidating, offensive, or hostile environment." COMDTINST 5350.6 ¶ 12(a) (2023). This definition does not contain any requirement that the target of the harassment hear or learn of the harassment in order for the behavior to create an offensive environment. *See id.* Although the regulation also states that "conduct . . . that has the purpose or effect of unreasonably interfering with an individual's work performance" qualifies as harassment (the portion of the definition that Plaintiff discusses), the

two triggers of harassment are separated by an "or." *Id.*; *see* Pl. MJAR at 20 (discussing lack of interference with OC K's work performance). The word "or" signifies the disjunctive, so either conduct "unreasonably interfering with an individual's work performance" or, separately, conduct "creating an intimidating, offensive, or hostile environment" can independently trigger the harassment definition. COMDTINST 5350.6 ¶ 12(a) (2023); *see Encino Motorcars, LLC v. Navarro*, 584 U.S. 79, 87 (2018) ("'[O]r' is 'almost always disjunctive.'" (quoting *United States v. Woods*, 571 U.S. 31, 45 (2013))). Where the regulation does not create a requirement that the target of the harassment hear about the harassment or personally have his work affected, the Court will not engage in judicial engraftment to add a requirement. *See Bostock v. Clayton Cnty.*, 590 U.S. 644, 674 (2020) ("[W]hen the meaning of the statute's terms is plain, our job is at an end.").

In addition, Plaintiff's argument that the Final Action Memo needed to further explain its reasoning linking the behavior to the harassment standard fails. Plaintiff argues that "[t]he [Final Action Memo] did not identify whose work performance or environment was affected." Pl. Reply at 4. However, the Coast Guard did not need to spell out the link in great detail in this case. Plaintiff fails to identify any requirement in the regulation or any other source of law that the Final Action Memo specifically state which type of harassment Plaintiff triggered under the regulation. *See id.* Under the APA standard, an agency need not explain every rational link in its deliberative process as long as a rational basis for the action is apparent from the record. *Bowman Transp.*, 419 U.S. at 286 ("[W]e will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned."). Here, the Final Action Memo states that Plaintiff engaged in harassing behavior in violation of COMDTINST 5350.6 when he "made several inappropriate comments regarding another OC on both 14 June and 04 July calling [] him [both] 'retard' and 'autistic,'" and the Final Action Memo cites both the anti-harassment policy and N.T.'s investigation. AR

44–45. It is readily apparent from this explanation and cited material that Captain Hill connected the actions identified in the investigation to the definition of harassment. *See id.* Upon this record, the Court can determine that the Coast Guard made a rational decision based on the evidence before it, and the Court can discern the path of the agency's decision. *See Barnick*, 591 F.3d at 1377.

### E. **Opportunity to Respond**

Plaintiff argues that "[t]he record does not show that, before final action, Mr. Rosene was provided the witness summaries, the Investigating Officer's findings, the arrest and debt materials later references in the Final Action Memorandum, or any meaningful opportunity to respond before the decision was finalized." Pl. MJAR at 21.[11] Defendant argues that "Mr. Rosene's separation was consistent with Coast Guard policy and procedure." Def. MJAR at 18.

Plaintiff fails to cite any authority in the anti-harassment policy, any other regulation, or any other source of law that required the Coast Guard to provide witness summaries, investigation findings, or an opportunity to respond before taking final action. *See* Pl. MJAR at 22. The only applicable requirement in the anti-harassment policy is that "[a] subject who exercises their right to appeal a substantiated finding of harassment, bullying or other misconduct under this policy shall, upon request, be provided with access to a redacted version of the investigative report." ALCOAST 282/23 (adding requirement to COMDTINST 5350.6 (2023) on Aug. 3, 2023).

[11] In his Reply, Plaintiff for the first time argues that the Coast Guard improperly denied him "notice . . . within five calendar days after finalizing the [Final Action Memo]." Pl. Reply at 7. As Plaintiff did not raise this claim in his MJAR, but only in his Reply, it has been waived. *See Newimar S.A. v. United States*, 160 Fed. Cl. 97, 124 (2022), *aff'd*, No. 2022-1949, 2023 WL 8534614 (Fed. Cir. Dec. 11, 2023) (Plaintiff waived arguments "because it did not raise them until its reply brief."); *see also Novosteel SA v. United States*, 284 F.3d 1261, 1274 (Fed. Cir. 2002) ("Raising the issue for the first time in a reply brief does not suffice; reply briefs *reply* to arguments made in the response brief—they do not provide the moving party with a new opportunity to present yet another issue for the court's consideration." (emphasis in original)).

According to the record, the Coast Guard met this requirement: Plaintiff himself acknowledged that he was "provided an opportunity to review the . . . investigative report," although he complained about the level of redactions in the report. AR 11. As the Coast Guard satisfied the rights that the anti-harassment policy granted Plaintiff and Plaintiff identifies no other source of law that guaranteed his right to view the relevant materials before the Coast Guard's final action, the Court will not disturb the Coast Guard's actions. *See Barnick*, 591 F.3d at 1381 (upholding decision when military followed proper procedure).

**II. Entitlement to Active Duty Pay**

In addition to his arguments against his disenrollment and separation, Plaintiff argues that he is entitled to continued active duty pay from the time of his suspension through the present. Pl. MJAR at 24 ("Because the Coast Guard did not lawfully discharge Mr. Rosene from active duty, he remains in service and remains entitled to active-duty pay and allowances."). Defendant argues that "Mr. Rosene fails to establish that he is entitled to backpay." Def. MJAR at 20.

"In general, a reservist is entitled to active duty pay only for the period that he is actually on active duty." *Barnick*, 591 F.3d at 1379. A reservist who served on "active duty with an indefinite service obligation" prior to his illegal separation is entitled to back pay as if he remained on active duty. *Groves v. United States*, 47 F.3d 1140, 1145 (Fed. Cir. 1995). However, a reservist who is not on active duty with an indefinite service obligation or who is on part-time reserve duty "has no lawful pay claim against the United States for unattended drills or for unperformed training duty" beyond any existing active duty assignments. *Palmer v. United States*, 168 F.3d 1310, 1314 (Fed. Cir. 1999).

On July 8, 2024, the Coast Guard suspended Plaintiff from the LDC training course. AR 82. At the time of his suspension, Plaintiff was training to become an officer in the Coast Guard

Reserves. *See id.* The record reveals that his last day of active duty was July 12, 2024.[12] AR 41. The record contains no evidence suggesting that Plaintiff had received any orders that would have otherwise kept him on active duty past July 12, 2024. *See* AR. Without any orders for subsequent active duty, Plaintiff cannot establish that his service in the Coast Guard Reserves would have entitled him to active duty pay. *See Barnick*, 591 F.3d at 1379; *Palmer*, 168 F.3d at 1314. As such, Plaintiff is not entitled to active duty pay for any date after July 12, 2024. *See* AR 41. The record contains no evidence that Plaintiff did not receive the full pay that he was owed for that time period. *See* AR. Absent any contrary evidence, the Court presumes that the military properly discharged its duties to pay Plaintiff. *See Doe*, 132 F.3d at 1434.

Plaintiff appears to argue that he was never properly discharged because he did not receive his final paycheck from the Coast Guard. Pl. MJAR at 23 ("He did not receive final pay, or a substantial part of it, at that time [of his suspension] or afterwards."); *see also* 10 U.S.C. § 1168(a) ("A member of an armed force may not be discharged or released from active duty until . . . his final pay or a substantial part of that pay, are ready for delivery to him or his next of kin or legal representative."). However, Plaintiff provides no evidence that he never received final pay. *See* Pl. MJAR at 23 (citing no evidence for claim of lack of pay). The AR contains no evidence that

---

[12] Defendant argues that Plaintiff's active duty orders were scheduled to end on July 10, 2024. Def. Reply at 14. Defendant cites an exhibit attached to its reply. *Id.* (citing ECF No. 18-1). The cited document is a travel order, which states that Plaintiff's short-term duty ends on July 10, 2024. ECF No. 18-1 at 2. However, the Court's review is limited to the AR, and this document was not included in the AR. *See Walls v. United States*, 582 F.3d 1358, 1367 (Fed. Cir. 2009) ("[R]eview under the APA is generally limited to the administrative record."); *AgustaWestland N. Am., Inc. v. United States*, 880 F.3d 1326, 1331 (Fed. Cir. 2018) ("The purpose of limiting judicial review to the record actually before the agency is to guard against courts using new evidence to 'convert the "arbitrary and capricious" standard into effectively de novo review.'" (quoting *Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1380 (Fed. Cir. 2009))). If Defendant sought to rely upon additional evidence to establish the date when Plaintiff's active duty orders were scheduled to end, it should have moved to supplement the AR with this evidence.

Plaintiff never received a final paycheck. *See* AR. Even if the exhibits that Plaintiff attached to his Complaint were part of the AR, none provide evidence that Plaintiff failed to receive a final paycheck. *See* ECF No. 1-1 (Plaintiff's exhibits). Plaintiff's "attorney argument" about the lack of a paycheck is not evidence. *Icon Health and Fitness, Inc. v. Strava, Inc.*, 849 F.3d 1034, 1043 (Fed. Cir. 2017) ("Attorney argument is not evidence."); *Chromalloy San Diego Corp. v. United States*, 145 Fed. Cl. 708, 744 (2019) (holding that "attorney argument" is insufficient to meet burden of motion for judgment on the administrative record). As Plaintiff has failed to present evidence that would prove his claim of an entitlement to continued active duty pay, he has not met his burden to produce evidence under the Rule 52.1(c) standard, and, absent any evidence, the Court must presume that the military upheld its obligation to pay him. *Stine*, 92 Fed. Cl. at 791; *see Bannum*, 404 F.3d at 1357 (requiring "record evidence" to prove facts on motion for judgment on the administrative record); *Doe*, 132 F.3d at 1434 (applying "strong, but rebuttable, presumption that administrators of the military, like other public officers, discharge their duties correctly, lawfully, and in good faith").

* * * * *

## CONCLUSION

Accordingly, for the reasons stated above, the Court **DENIES** Plaintiff's Corrected Motion for Judgment on the Administrative Record (ECF No. 15). The Court **GRANTS** Defendant's Cross-Motion for Judgment on the Administrative Record (ECF No. 16). The Clerk of Court is **DIRECTED** to enter Judgment accordingly and mark this case as closed.

IT IS SO ORDERED.

*Eleni M. Roumel*

ELENI M. ROUMEL
Judge

September 3, 2026
Washington, D.C.